IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RONNIE DALE HILL, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:20-CV-1914-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Consent Case[1] |

## MEMORANDUM OPINION AND ORDER

Ronnie Dale Hill (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (*See* doc. 1.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.    BACKGROUND

On October 11, 2017, Plaintiff filed his application for SSI, alleging disability beginning January 15, 2015. (doc. 18-1 at 15, 103-107, 244-249.)[2] His claim was denied initially on December 20, 2017, and upon reconsideration on March 21, 2018. (*Id*. at 103-107, 118-123.) On March 29, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id*. at 144-145.) He appeared and testified at an initial hearing held on March 25, 2019, but he did not appear or testify at a supplemental hearing on July 17, 2019. (*Id*. at 36-73, 75-97.) On August 5, 2019, the ALJ issued a decision finding him not disabled. (*Id*. at 12-14.)

---

[1] By consent of the parties and order filed December 17, 2020 (doc. 20), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 27, 2019. (*Id*. at 239-41.) The Appeals Council denied his request for review on May 19, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5-8.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

## A.  Age, Education, and Work Experience

Plaintiff was born on July 15, 1967, and was 50 years old at the time of the hearing. (*Id*. at 27, 242, 244.)  He had at least a high school education and was able to communicate in English. (*Id*. at 27.)  He had no past relevant work. (*Id*. at 27, 81-82.)

## B.  Medical, Psychological, and Psychiatric Evidence

In approximately 1985, Plaintiff required surgery to ameliorate an initial fracture to his left hip. (*Id*. at 455.)  Around 1997, he underwent a second surgical procedure, likely a "revision cup", that allowed him to rotate. (*Id*.)

On February 22, 2015, Plaintiff was hospitalized at Medical Center of McKinney (MCM) for three days for injuries from a motor vehicle rollover accident. (*Id*. at 368-82.) He sustained a left acetabular fracture and a concussion. (*Id*. at 381.) Images of his pelvis showed the appearance of a left hip prosthesis but no acute osseous abnormality, and a computerized tomography (CT) scan revealed moderate diffuse posterior disc bulge or protrusion at L4/5 and mild degenerative changes and posterior disc-osteophyte protrusions in the cervical spine. (*Id*. at 412.) No acute abnormalities were shown in his head or left shoulder. (*Id*. at 394, 417, 427.)  Plaintiff was advised to remain non-weight bearing on his left hip for up to eight weeks, follow up with an orthopedic specialist, and continue his physical therapy and occupational therapy at home. (*Id*. at 369.)  He was prescribed Robaxin, Narco, and Lovenox, as well as a pair of crutches. (*Id*. at 368, 370.)

2

On May 19, 2016, Plaintiff presented to the emergency room (ER) at MCM for back and leg pain over the prior few months. (*Id*. at 332-33.) A CT scan of his lumbar spine showed, at L5/S1, mild neural foraminal narrowing secondary to spurring. (*Id*. at 337.) Additional imaging showed that his left hip prosthesis had rotated, so arrangements were made for him to see an orthopedist that week. (*Id*. at 339.) Upon physical examination, diffuse tenderness was observed across the mid lumbar region. (*Id*. at 336.) In the lower left extremity, a limited range of motion of the left hip due to pain was also observed. (*Id.*) He was diagnosed with left hip pain, complications of internal hip prosthesis, and low back pain. (*Id*. at 340.) Plaintiff was prescribed Tylenol #3, Valium, and a Medrol dose pack. (*Id.*)

On April 27, 2017, Richard Buch, M.D., at Pine Creek Medical Center, performed a revision procedure with extensive acetabuloplasty and reconstruction with an allograft, fexor release, and complex closure and complete release of the sciatic nerve procedure. (*Id.* at 449-69.) Post-operatively, he diagnosed dislocation and shortening of Plaintiff's left hip with gross loosening association of his acetabular component with extensive acetabular defect and scarring. (*Id.* at 455.)

On November 12, 2017, Plaintiff was taken to the ER at MCM after he was involved in another motor vehicle accident. (*Id*. at 502.) X-ray scans of his lumbar spine showed L5/S1 degenerative disc disease. (*Id*. at 517.) A CT scan of his cervical spine showed multilevel degenerative disc disease and spondylosis. (*Id*. at 515.) His back inspection was normal with full range of motion. (*Id*. at 510.) No motor or sensory deficits were observed. (*Id.*) Plaintiff was diagnosed with a cervical strain and prescribed Motrin. (*Id*. at 512.)

On December 18, 2017, State Agency Medical Consultant (SAMC) Patty Rowley, M.D., examined Plaintiff's medical records. (*Id*. at 103-07.) She noted that he claimed hypertension and

arthritis of the left hip, shoulder, feet, hands, ankles, wrist, and fingers; she also noted that a list of his activities of daily living had been requested but was not received. (*Id.* at 105.) Dr. Rowley concluded that there was insufficient evidence to evaluate his claim, as there was no Residual Functional Capacity (RFC) Assessment. (*Id.*)

On March 5, 2018, SAMC Robin Rosenstock, M.D., reviewed Plaintiff's medical records. (*Id.* at 112-23.) He noted that an activities-of-daily-living report had been requested and not returned. (*Id.* at 114.)  Dr. Rosenstock also determined that a consultative examination would not be scheduled, since Plaintiff had not cooperated by providing the requested report, and that all case development efforts requiring his cooperation had been discontinued. (*Id.*) He affirmed Dr. Rowley's opinion of insufficient evidence to make a medical determination. (*Id.*)

On July 31, 2018, Plaintiff returned to MCM after involvement in a motorcycle collision and was hospitalized for eleven days. (*Id*. at 570.) He sustained multiple injuries, including multi-focal fractures of the left sided ribs with a potential left flail chest; a fractured left clavicle and scapula; fractures of the left inferior and superior pubic rami; and chronic loosening based to the prosthetic left acetabulum. (*Id.* at 578.) X-ray scans of his left leg revealed no definite acute fracture, but some soft tissue swelling in the thigh, as well as post-surgical changes of the left femur with lucency in the superior aspect of the greater thochanter. (*Id*. at 579.) A CT of his cervical spine demonstrated no fractures or acute abnormalities but did show degenerative changes throughout. (*Id*. at 577.) Plaintiff underwent a video-assisted thorascopy and rib plating for his left flail chest and the rib fractures on his left side. (*Id*. at 593.) He was diagnosed with left rib fractures, including a flail segment; left pulmonary contusion; left superior and inferior pubic rami fractures; left clavicle fracture; and left scapula fracture. (*Id*. at 563.) He was advised to remain non-weight

4

bearing on his left lower extremity and placed in a shoulder immobilizer. (*Id*. at 563.) He was prescribed Ultram, Gabapentin, Lovenox, and Flexeril. (*Id*. at 563-64.)

On September 27, 2018, Plaintiff presented at MCM for breathing problems. (*Id*. at 490-97.) Upon physical examination, no abnormalities were observed. (*Id.*) His breath sounds[3] were normal bilaterally, and no respiratory distress, rales, rhonchi, wheezing, stridor, or crepitus was observed. (*Id*. at 493.) His heart rate, rhythm, and sounds[4] were normal, and no abnormalities were observed during his back, musculoskeletal, or neurological examinations. (*Id.*) He was diagnosed with a cough and advised to follow up with his primary care provider. (*Id*. at 496.)

On March 22, 2019, Family Nurse Practitioner (FNP)[5] Jan Stalder (FNP Stalder) noted in a letter on behalf of Michael Farrell, M.D., at Frontier Family Health, that Plaintiff had failed his Department of Transportation medical examination for his commercial driver's license (CDL). (*Id*. at 554.) The letter explained he failed key requirements because he was not able to raise both of his legs, his deep tendon reflexes were poor bilaterally, and his range of motion in both of his upper extremities was markedly impaired. (*Id*.) There were no physical examination records to supplement the letter. (*Id.*)

On May 25, 2019, Shahzad Chindhy, M.D., at EverMed Exams, performed a consultative examination at the request of the State agency. (*Id*. at 57, 944-50.) Plaintiff reported mild achiness

---

[3] Breath sounds are created when air flows into the upper respiratory tract, the trachea, and the central bronchi. Paul Forgacs et al., Breath Sounds, NCBI, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1019084/.

[4] Heart sounds occur when blood flows through the heart chambers as the cardiac valves open and close during the cardiac cycle. Sean Dornbush & Andre Turnquest, *Physiology, Heart Sounds*, NCBI (last updated July 26, 2020), https://www.ncbi.nlm.nih.gov/books/NBK541010/.

[5] FNPs are advanced practice registered nurses who provide primary health care services to people of all ages. *Family Nurse Practitioner*, Nurse.org, https://nurse.org/resources/family-nurse-practitioner (last visited Mar. 29, 2022).

on his left side that worsened with prolonged standing; he could walk about 2 blocks before experiencing pain. (*Id*. at 944.) He also reported pain and achiness in his left collarbone and left rib areas, which he rated at 1 out of 10, and which was alleviated by BC powder. (*Id*.) On a typical day, Plaintiff performed housework, drove, did laundry, and walked. (*Id*. at 945.) Based on his typical evaluation, Dr. Chindhy diagnosed Plaintiff with left hip post-traumatic arthritis. (*Id*. at 947.) He found no evidence of arthritis in the shoulders, wrists, hands, fingers, feet, or ankles; those joints showed normal range of motion with no tenderness to palpation and no swelling. (*Id*.) Dr. Chindhy determined that Plaintiff had no limitations with sitting, standing or walking; did not need an assistive device for short and long distances but did need a cane for uneven terrain, given his asymmetric gait; had limitations with lifting and carrying weight due to left hip arthritis; had no limitations on reaching, grasping, handling, fingering, feeling, bending, stooping, crouching and squatting; and had no relevant visual, communicative or work place environmental limitations. (*Id.* at 947-48.)

On June 25, 2019, Dr. Chindhy completed a Medical Source Statement regarding Plaintiff's ability to do physical work-related activities. (*Id.* at 952-57.) He opined that Plaintiff could continuously lift up to 10 pounds, frequently lift 11 to 20 pounds, and occasionally lift 21 to 100 pounds; and continuously carry up to 10 pounds, frequently carry 11 to 20 pounds, and occasionally carry 21 to 100 pounds. (*Id.* at 952.) He could sit 1 hour, stand 30 minutes, and walk 30 minutes at a time; he could sit 3 hours, stand 3 hours, and walk 2 hours in an 8-hour workday. (*Id.* at 953.) Dr. Chindhy checked "no" in response to the question about whether Plaintiff required the use of a cane to ambulate. (*Id.*) Plaintiff could continuously balance, stop, kneel, crouch, crawl, handle, finger, feel, push/pull, and reach in all directions, including overhead; operate foot controls continuously with the right foot and occasionally with the left foot; and frequently climb stairs,

6

ramps, ladders, or scaffolds. (*Id.* at 954-55.) He could tolerate exposure continuously to pulmonary irritants, extreme cold/heat, vibrations, humidity and wetness; frequently to moving mechanical parts; and occasionally to unprotected heights. (*Id.* at 956.) He could operate a motor vehicle. (*Id.*) Four times, he identified "left hip arthritis" as the finding supporting his assessments. (*Id.* at 952, 954-56.) Dr. Chindhy concluded that Plaintiff's limitations had lasted or would be expected to last for 12 consecutive months. (*Id.* at 957.)

## C. **March 25, 2019 Hearing**

On March 25, 2019, Plaintiff and a vocational expert (VE) appeared and testified at an initial hearing before the ALJ. (*Id.* at 36-73.) Plaintiff was represented by an attorney. (*Id* at 38.)[6]

### 1. *Plaintiff's Testimony*

Plaintiff testified that he resided in Anna, Texas, in his sister's home with his wife and "whoever [he had] to live with at the time." (*Id.* at 43-44.) He earned income by picking up cans and scrapping every day, while his wife cleaned houses. (*Id.* at 44.) He did not know how much his wife made per month, and he was not receiving governmental assistance. (*Id.*)

Plaintiff was 5'10", weighed 185 pounds, and was right-handed. (*Id.*) He had a driver's license and did not have a CDL because he did not pass the physical examination on March 21, 2019. (*Id.* at 44-45.)

Plaintiff testified that he could lift his left leg "not far off the ground" but he could not hold it up. (*Id.* at 45.) When asked what kind of trouble he was having with his arms, Plaintiff testified that he had scarring and his rib cage had been replaced at Plano Medical in August. (*Id.* at 46.) All

---

[6] At the beginning of the hearing, the ALJ noted that he had received from the attorney a March 21, 2019 letter by FNP Stalder regarding Plaintiff's CDL, a copy of a fee agreement, and a Form SSA-1696. (doc. 18-1 at 39.)

his ribs had been crushed, he had a hole in his lungs and a tube out of his back, and he broke his shoulders and collar bone. (*Id.* at 46-47.)[7]

Plaintiff had last worked full time a "couple" years before. (*Id.* at 47.) He had been on crutches "off and on" and in a wheelchair. (*Id.*) He did not drive at all and did not have a vehicle; a friend had driven him to the hearing. (*Id.* at 47-48.)

Plaintiff believed that his left leg and hip were the biggest medical problems that prevented him from working full time; his leg went "numb dead" after sitting for about ten or fifteen minutes and it took a little while for him to get the feeling back. (*Id.* at 48, 50.) Multiple surgeries had been performed on his left leg; the last was in 2017. (*Id.*) After revision surgery, he could walk without crutches but had to use a cane, although he did not bring it with him to the hearing. (*Id.* at 48-49.) While Plaintiff obtained assistance to pay for his hip surgery, he was not able to receive physical therapy because the Texas Department of Assistive and Rehabilitation Services (DARS) would not help pay for it. (*Id.* at 49.) He was not receiving treatment or taking medications at the time, but BC Powder provided temporary relief. (*Id.* at 50.)

Plaintiff did not have a good range of motion in the morning and used a cane mostly on cold days and when he got up in the morning. (*Id.* at 51.) He could walk about 25 yards on a regular basis and stand comfortably for a few minutes before his hip and back began to hurt. (*Id.* at 51-52.) He stuffed a piece of cardboard in one of his shoes to level out the weight because one side of his hip was half an inch or an inch shorter that the other side. (*Id.* at 53.) When he walked, he felt pain around his back due to incorrect weight distribution, but he had not been able to go to any

---

[7] The ALJ noted that sometimes not all of the records are received and that this appeared to be one of those cases. (doc. 18-1 at 46-47.) He stated that he would hold the record open to see if those records could be obtained, because if Plaintiff was having problems with his arms the ALJ could not find any limitations with Plaintiff's arms in the current record. (*Id.* at 47.)

therapy for it. (*Id.*) Lying or sitting wrong made his back pain worse; his most comfortable position was in a recliner with his feet up and his head in a bent position. (*Id.* at 53-54.)

Plaintiff could lift 25 pounds comfortably, but he could not carry it for fear that his hip might break. (*Id.* at 54.) After he had crushed it in a recent motorcycle wreck, his rib cage was replaced. (*Id.*) He was not receiving ongoing treatment for it because he lacked insurance. (*Id.* at 55.) Plaintiff could extend his left arm all the way up, but it did not have full motion. (*Id.*) He could not lift 25 pounds for two hours or more because he would not be using the right muscles to carry the weight, and he could not position himself correctly. (*Id.* at 64.)

Plaintiff had three good days out of the week; the rest were bad. (*Id.* at 61.) On good days, he tried to go outside quicker to roll the trash can out to the road or to scrap for about an hour with breaks. (*Id.* at 61-62.) On bad days, he did not do anything because his pain level was high. (*Id.* at 62-63.) He did not take pills because he did not want to get back on the "drug rolls"; he had quit using methamphetamine after he got out of prison in 2013. (*Id.* at 63, 65.)

### 2. VE's Testimony

The VE testified that there had not been any prior personal or professional contact between him and Plaintiff; he understood his role to be an impartial witness even though the government was paying his fee; and he had not had any discussions with the ALJ, Plaintiff, or his attorney, about the merits of the case. (*Id.* at 65-66.) He was familiar with the Administration's definitions of unskilled, semi-skilled, skilled, sedentary, light, medium, heavy and very heavy work; and he would identify any conflicts between his testimony and the Dictionary of Occupational Titles (DOT). (*Id.* at 66.) He had reviewed the exhibits in Plaintiff's file that were made available to him before the hearing, and he did not need any additional information about Plaintiff's past work. (*Id.*

at 66.) The VE classified Plaintiff's past work as a truck driver, DOT 904.683-010 (semi-skilled, medium, SVP-4)[8], as it was actually and generally performed. (*Id.*)

The VE first considered a hypothetical individual who could perform light work, as defined by the regulations, and occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and who could not drive a motor vehicle as part of his job duties or have exposure to hazards such as dangerous moving machinery (including a motor vehicle) or unprotected heights. (*Id.* at 67.) The individual could not perform any of Plaintiff's past work. (*Id.*) There were light, unskilled jobs that this individual could perform, including packer, DOT 529.687-186 (unskilled, light, SVP-2), with 800,000 jobs nationally and 80,000 in the region; assembler, DOT 700.684-070 (unskilled, light, SVP-2), with 520,000 jobs nationally and 52,000 in the region; and wire sorter, DOT 728.684-022 (unskilled, light, SVP-2), with 65,000 jobs nationally and 6,500 in the region. (*Id.*) These jobs would be consistent with the DOT. (*Id.* at 68.)

The VE considered a second hypothetical individual who was limited to sedentary work, as defined by the regulations, and could only occasionally operate foot controls with the lower left extremity, could not engage in overhead reaching with the left upper extremity, and could not have exposure to extreme cold. (*Id.*) With these limitations, unskilled sedentary jobs could be considered until Plaintiff turned 50. (*Id.*) He was 47 at the alleged onset date, so the unskilled sedentary jobs that could be considered until that date included eye glass frame packer, DOT 713.684-038 (unskilled, sedentary, SVP-2), with 110,000 jobs nationally and 11,000 jobs in the region; semi-conductor packer, DOT 726.687-030 (unskilled, sedentary, SVP-2), with 224,000 jobs nationally and 22,400 jobs in the region; and shade assembler, DOT 739.684-094 (unskilled,

---

[8] SVP stands for Specific Vocation Preparation.

sedentary, SVP-2), with 112,000 jobs nationally and 11,200 jobs in the region. (*Id*. at 68-69.)  This testimony was consistent with the DOT. (*Id.* at 69.)

The VE confirmed that the DOT did not specifically break down the dexterity limited to one side or another and instead addressed bi-manual dexterity. (*Id.*)  It also did not specifically address whether reaching was overhead or otherwise, only reaching in general. (*Id.*) When those types of limitations came up, the VE relied on his experience in placing people in jobs, observing the jobs being performed, and talking with front line supervisors and employers about what jobs require and how they are normally performed. (*Id.*)

The ALJ noted that Plaintiff had changed age categories to the approaching advanced age category during the pendency of his application, which would result in a medical vocational rule directing a finding of disability as of Plaintiff's 50th birthday, and that he had past semi-skilled work at the SVP-4 level as a truck driver. (*Id.* at 69-70.) The VE testified there were no driving skills that might translate to the sedentary unskilled exertional level. (*Id.* at 70.)

The VE considered a third hypothetical individual with the same limitations as the second, but who required a single hand-held assistive device such as a cane for ambulating distances of 50 feet or over rough or uneven terrain. (*Id.*) There was no impact on the jobs he had identified because they were performed primarily in a seated position for two hours at a time before a designated break and did not require any extensive ambulation or walking; an individual's use of a cane would not preclude jobs where he was seated the whole time. (*Id.*) Some sedentary jobs would be precluded, but he had not testified about those. (*Id.*)

The VE considered a fourth hypothetical individual with the same limitations, except he could only sit for periods of up to 30 minutes at a time, after which he would need a break of at least five minutes, during which he would be off task because he would be unable to remain at the

workstation. (*Id*. at 71.) These limitations would preclude the jobs previously identified because an individual in these positions would need to be able to maintain work for a two-hour period and have to take a 5-minute break every hour. (*Id*.) The VE's testimony with respect to hypotheticals three and four was consistent with the DOT. (*Id*.)

## D.  <u>July 17, 2019 Hearing</u>

On July 17, 2019, a second VE testified at a supplemental hearing before the ALJ. (*Id*. at 77-97.) Plaintiff did not appear but was represented by an attorney.[9] (*Id*. at 77-78.)

The VE confirmed that she had not had any prior personal or professional contact with Plaintiff, that she understood that her role as an impartial witness although the government was paying her a fee, and that she had not had any discussions with the ALJ, Plaintiff's attorney, or Plaintiff about the merits of this case. (*Id*. at 80-81.) She was familiar with the Administration's regulatory definitions regarding different kinds of work, she would identify any conflicts between her opinion and the DOT, and she had reviewed certain exhibits from Plaintiff's file made available to her before the hearing. (*Id*. at 81.) The VE had sufficient information for the period from 2011 to 2015 to form an opinion about Plaintiff's past work, which she classified as tractor trailer truck driver, DOT 904.383-010 (medium, SVP-4). (*Id*. at 82.)

The ALJ noted that several hypotheticals had been discussed at the prior hearing, but they would "start over" at the first hypothetical for purposes of the supplemental hearing. (*Id*.)

The VE considered a hypothetical individual who could perform light work, as defined by the regulations, and frequently climb ladders, ropes, scaffolds, ramps or stairs; occasionally

---

[9] The ALJ explained that Plaintiff was not present due to a mix up regarding the time of the hearing, but he was on his way. (*Id*. at 77.) The attorney confirmed he had spoken with Plaintiff, who agreed they should proceed and take the VE testimony without him; the attorney also stated that there had been no change in Plaintiff's condition since the last hearing. (*Id*. at 77-78.)

operate foot controls with the lower left extremity; have occasional exposure to unprotected heights and frequent exposure to moving mechanical parts; and operate a motor vehicle. (*Id.*) The individual could not perform any of Plaintiff's past work. (*Id.*) At the light exertional level, the individual could perform the jobs of office helper, DOT 239.567-010 (light, SVP-2), with 115,000 jobs nationally; cafeteria attendant, DOT 311.677-010 (light, SVP-2), with 60,000 jobs nationally; and merchandise marker, DOT 209.587-034 (light, SVP-2), with 270,000 jobs nationally. (*Id.* at 83.) The VE's testimony about these jobs was consistent with the DOT. (*Id.*)

The VE considered a second hypothetical individual who required a hand-held assistive device such as a cane for walking over rough or uneven terrain only. (*Id.*) Using a cane would not have any impact on the jobs she identified. (*Id.*) Her testimony was not similar to what was addressed in the DOT and was based on her experience in the field of vocational rehabilitation and job placement. (*Id.*)

The VE considered a third hypothetical individual who could sit for 1 hour at a time, stand for 30 minutes at a time, walk for 30 minutes at a time, would need a 5 minute period in a different position, and would be able to stay on task to the extent that it was consistent with his job duties. (*Id.* at 84.)[10] Of the jobs she had identified, the office helper would not be affected or impacted because that job lent itself to alternating sitting, standing, and walking positions. (*Id.*) The cafeteria attendant would be slightly eroded,[11] even though there would be periods "here and there" where

---

[10] The VE asked for clarification. (*Id.*) She stated that she understood that the individual would alternate among the three positions—sitting, standing, and walking—and she asked about the individual needing to be in an alternate position for 5 minutes. (*Id.*) The ALJ responded that the individual would either alternate positions or stay in the alternate position at least 5 minutes and then resume the prior position. (*Id.*)

[11] Erosion occurs when the reduction of an individual's exertional or non-exertional capacity limits the individual to perform the full range of sedentary work, i.e., the occupational base will be "eroded" by the individual's additional limitations or restrictions. *See* SSR 96-9p, "Policy Interpretation Ruling Titles II and XVI: Determining Capability to do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work."

the individual could sit briefly for 5 minutes. (*Id.* at 84-85.) The price marker[12] would be eroded as well, to the extent that the individual performing a task while in a sitting position would sometimes need to stand more than 30 minutes or walk more than 30 minutes. (*Id.* at 85.) The VE did not think any of these occupations would be precluded entirely. (*Id.*) She estimated the extent of the erosion as zero for the office helper, 30 percent for the cafeteria attendant, and 50 percent or more for the merchandise marker. (*Id.*)  When asked to identify any other job to replace the merchandise marker, the VE responded with ticket seller, DOT 211.467-030 (light, SVP-2), with 21,000 jobs. (*Id.*)

The DOT did not address sit-stand-walk options. (*Id.* at 85-86.)  The VE's testimony was based on her experience and expertise in the field of vocational rehabilitation. (*Id.* at 86.)  Different factors were involved in obtaining a sit-stand option at work. (*Id.*) Individuals would have to look at the job tasks and functions; if they were able to be performed sitting, standing, or either, there would be no need to discuss the option with the employer. (*Id.*) If an employers preferred that the individual not sit at the job, that job would be precluded, but that would not be in every case. (*Id.* at 86-87.) It was really a function of what the individual was doing on the job and how it was normally done. (*Id.* at 87.) A doctor's note would not be needed to obtain a sit-stand option in the types of jobs that she had identified. (*Id.*)

The VE was familiar with the term reasonable accommodation as typically used. (*Id.*)  A sit-stand option could be performed in the normal course of employment, particularly in jobs that required clerical office-type work, but it could also be considered a reasonable accommodation, especially if it would take an employee off-task or change how tasks were performed to the extent

---

[12] The VE stated price marker, although merchandise marker was the third job she had identified. (*Id.* at 85.)

it affected the business as a whole or the workings of the office. (*Id.* at 87-88.) It was a legal decision for the courts to decide case by case. (*Id.*) There could also be an informal agreement with the employer. (*Id.* at 87.) The VE did not think the sit-stand-walk option would impact an individual's ability to perform standard job tasks in the office helper job, although there might be an impact on days involving more filing, a common task for an office helper; the individual would be up more that day than during one spent manning the phones. (*Id.* at 88.) The impact would not be permanent, but temporary, depending on how the job tasks changed and alternated. (*Id.* at 89.) A day involving more than usual filing, but during which the office helper was unable to sit, stand, or walk for more than a specific period of time, would impact the individual. (*Id.*) There were occasions when the individual might be allowed to sit and file, and modifications might be made on a temporary basis to allow the individual to not stand any more than he could, so there would be an impact, but not a "permanent impact per se." (*Id.*) There was "possibly" a risk of termination if the sit-stand option was required. (*Id.*) There might be some degree of erosion on the individual's ability to maintain employment as an office helper in a competitive work setting, but it was 20 percent at most. (*Id.* at 89-90.) That might just involve the type of jobs that might be less conducive to the sit-stand option. (*Id.* at 90.)

On cross-examination, the VE confirmed that all three of the jobs she cited were classified as light work in the DOT. (*Id.*) The attorney noted that in the DOT, light work normally required up to 6 hours of standing and walking during an 8-hour workday, and he asked if there was a reason why the jobs were classified as light even though they did not require standing and walking for 6 hours in an 8-hour workday. (*Id.*) The VE responded that it depended, and that these jobs varied. (*Id.*) The office helper could at times need to lift more than 10 pounds, such as lifting a 15-to-20 pound file box. (*Id.*) Lifting for the cafeteria attendant and merchandise marker would not

really be an issue, while standing and walking would be an issue for the cafeteria attendant. (*Id.* at 90-91.) It certainly could be a factor when the DOT is classifying jobs. (*Id.* at 91.)

The attorney asked whether an individual who was limited to 30 minutes of standing and walking would have available jobs that were classified more as sedentary than as light work. (*Id.*) The VE responded that the officer helper and the ticket seller could be classified more as sedentary, but the cafeteria attendant and merchandise maker were more light because of the standing and walking requirements. (*Id.*) The VE had seen these jobs actually performed as described in the hypothetical within the last 5 years. (*Id.* at 92.) Her estimate of 20 to 30 percent erosion included all full-time jobs and did not include part-time jobs. (*Id.*)

The attorney asked the VE whether her answer to the original hypothetical would be affected if the individual could stand or walk a total of 30 minutes before having to sit down, as opposed to an individual who could sit or stand for 1 hour. (*Id.*) The VE replied that the answer would be the same; it would erode the jobs of cafeteria attendant and the merchandise marker, but not that of the officer helper whose tasks lent themselves to being able to alternate positions. (*Id.*) There would be occasions in the jobs that she mentioned where the individual would be standing and walking more than 30 minutes at a time. (*Id.* at 94.)

The ALJ asked the VE to consider a hypothetical individual restricted to sedentary work, as generally defined by the regulations, with the same limitations as in the prior hypotheticals, including the sit-stand-walk option. (*Id.*) She testified that jobs at the sedentary exertional level within those parameters which the individual would be able to perform included addresser, DOT 209.587-010 (sedentary, SVP-2), with 88,000 jobs; order clerk food and beverage, DOT 209.567-014 (sedentary, SVP-2), with 40,000 jobs; document preparer, DOT 249.587-018 (sedentary, SVP-

2), with 45,000 jobs. (*Id.* at 95.) The sit-stand-walk option would not impact these jobs at all. (*Id.*) Her testimony about these jobs was consistent with the DOT. (*Id.*)

Finally, the VE considered a hypothetical individual who could meet the lifting requirements of light work; sit for 3 hours, stand for 3 hours, and walk for 2 hours in an 8-hour workday; and have the sit-stand-walk option. (*Id.* at 95-96.) She thought sedentary and light occupations would be eliminated, relying on her experience and expertise in the field of vocational rehabilitation, as that would not be specifically addressed in the DOT. (*Id.* at 96.)

## E.  ALJ's Findings

The ALJ issued a decision denying benefits on August 5, 2019. (*Id.* at 12-14.) At step one, he found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 11, 2017. (*Id.* at 18.) At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, left hip fracture, status-post replacement and revision. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). (*Id.* at 21.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), with the following limitations: lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; frequently climb ramps, stairs, ladders, ropes, or scaffolds; occasionally operate foot controls with the left lower extremity; have occasional exposure to unprotected heights; frequently work in proximity to moving mechanical parts and operate a motor

17

vehicle; and must be able to use a single hand-held assistive device such as a cane for ambulating over rough or uneven terrain. (*Id*. at 22.)

At step four, the ALJ determined that Plaintiff was unable to perform his past work. (*Id*. at 27). At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*. at 28.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from October 11, 2017, through the date of his decision. (*Id*. at 29.)

## II.     STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

18

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for DIB are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

19

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.     ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.   Whether the ALJ erred by failing to properly address the persuasiveness of the opinion of [the] SSA's examining doctor pursuant to 20 C.F.R. § 416.920c.

2.   Whether the ALJ erred by failing to articulate the persuasiveness of the opinion of [FNP Stalder], *at all*, pursuant to 20 C.F.R. § 416.920c.

(doc. 22 at 1) (emphasis in original).

### IV.     MEDICAL SOURCE OPINIONS

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical

finding(s), including those from [his] medical sources." *Id.* § 404.1520(a)(3), § 404.1520c(a).[13] A medical opinion is a statement from a medical source about what the claimant can still do despite his impairment(s) and whether he has one or more impairment-related limitations or restrictions in the following abilities:

(i) [his] ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) [his] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co- workers, or work pressures in a work setting;

(iii) [his] ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) [his] ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* § 404.1513(a)(2)(i)-(iv).

The guidelines provide that the ALJ will explain in his determination or decision how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* § 416.920c(b).[14] Five factors are considered in evaluating the

---

[13] On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. See Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. See *Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Plaintiff filed his application after the effective date, so the new 2017 regulations apply.

[14] When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors", but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. 20 C.F.R. § 416.920c(b)(1).

persuasiveness of the medical opinion(s): (1) supportability;[15] (2) consistency;[16] (3) relationship with the claimant;[17] (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." *See id.* § 404.1520c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *See id.* § 404.1520c(a). The ALJ will "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision." 20 C.F.R. § 404.1520c(b)(2). He may, but is not required to, explain how he considered the remaining factors. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). Although the ALJ evaluates the persuasiveness of the opinions when determining disability, the sole responsibility for a disability determination rests with the ALJ. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

## A.  Dr. Chindhy's Opinions

Plaintiff first argues that the ALJ erred by failing to properly address the persuasiveness of the opinions of Dr. Chindhy, the consultative examiner, under 20 C.F.R. § 416.920c. (doc. 22 at 1, 3, 6, 11.) He claims that the ALJ's decision is "contrary to law" and not supported by substantial evidence, relying instead on lay opinion, a highly selective reading of the record, and

---

[15] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ..., the more persuasive the medical opinions ... will be." 20 C.F.R. § 404.1520c(c)(1).

[16] "The more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." 20 C.F.R. § 404.1520c(c)(2).

[17] This factor combines consideration of the (i) length of treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment; (iv) extent of the treatment relationship; and (v) examining relationship. 20 C.F.R. § 416.920c(c)(3)(i)-(v).

mischaracterizations of some evidence. (*Id*. at 4.)

Here, the ALJ found that Plaintiff had normal 5/5 muscle strength; normal range of motion; no joint swelling, effusion or erythema were observed; there was no evidence of arthritis in the shoulders, wrists, hands, fingers, feet, or ankles; and BC powder reportedly alleviated his pain. (doc. 18-1 at 25 (citing *id*. at 50, 54, 493, 510, 514, 945-47.))  Despite his claim of being in pain most of the time, Plaintiff was not taking medication for his hip or receiving physical therapy; he did not like to take pain medications. (*Id*. at 23 (citing *id*. at 54.))  Since his motorcycle accident in July 2018, Plaintiff had not received ongoing treatment despite suffering several fracture or broken bones. (*Id*. at 23 (citing *id*. at 54-55.))  The ALJ found that Plaintiff's left hip post-traumatic arthritis was not severe. (*Id*. at 21 (citing *id*. at 947.))

The ALJ first considered Dr. Chindhy's May 2019 consultative examination report and its findings that Plaintiff had no limitations in his ability to sit, stand, walk, bend, stoop, crouch, squat, reach, grasp, handle, finger, feel; no visual, communicative or work place environmental limitations; and did not need an assistive device for short or long distances but did need a cane for uneven terrain; and that he was limited in his ability to lift and/or carry. (*Id*. at 26 (citing *id*. at 944-48.)) The ALJ found it "persuasive" because it was supported by Dr. Chindhy's own "relatively normal" physical examination findings and was consistent with Plaintiff's "relatively mild" physical complaints and limited medical treatment. (*Id*. at 26 (citing *id*. at 944-48.))

The ALJ also considered Dr. Chindhy's June 2019 medical source statement and its findings that Plaintiff could frequently lift up to 20 pounds and continuously lift up to 10 pounds; sit for 1 hour at a time for a total of 3 hours in an 8-hour workday; stand for 30 minutes at a time for a total of 3 hours; walk for 30 minutes at a time for a total of 2 hours; continuously balance,

stoop, kneel, crouch, crawl, reach, handle, finger, feel, push and/or pull; continuously operate foot controls with the right lower extremity and occasionally operate foot controls with the left lower extremity; frequently climb stairs, ramps, ladders, scaffolds, or be exposed to moving mechanical parts; occasionally be exposed to unprotected heights; and operate a motor vehicle. (*Id.* at 26-27 (citing *id.* at 952-58.))  The ALJ found "portions" of the medical source statement "unpersuasive" because they were not supported by, and "generally inconsistent" with, his May 2019 consultative examination. (*Id.* at 27 (citing *id.* at 952-58.))

Although the ALJ did not make specific findings for each of the five factors in 20 C.F.R. § 404.1520(c)(1)-(5), he specifically stated that he considered the medical opinion evidence and prior administrative medical findings according to the requirements set out in 20 C.F.R. § 416.920c. (*Id.* at 23.)  As noted, his decision reflects specific consideration of supportability and consistency, which are the two most important factors in evaluating the persuasiveness of medical opinions. 20 C.F.R. § 416.920c(b)(2). The ALJ expressly found that Dr. Chindhy's consultative examination, an "actual narrative statement", was more persuasive than his medical source statement, a "checked box form", because it was "obviously not a cut-and-paste type narrative", and it included a cane for ambulation on uneven terrain, which he found "indicate[d] a degree of nuance." (*Id.* at 27 (citing *id.* at 944-48, 952-58.)) His medical source statement was only a "brief and conclusory" check-box form that did not include any explanatory notes or supporting examinations or tests and merely included four handwritten notes that he based his assessment on Plaintiff's left hip arthritis. (*See* doc. 18-1 at 949-957.) The ALJ could therefore properly discount portions of the medical source statement as lacking substantive explanation. *See Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860, at *20 (N.D. Tex. Dec. 4, 2020) (illustrating how less

24

persuasive a brief and conclusory questionnaire stands in comparison to a narrative statement, which contains substantive explanation); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011) (agreeing with the magistrate judge's conclusion that the ALJ did not err in assigning only little weight to a brief and conclusory questionnaire).  He explained his reasoning for finding persuasive the consultative examination and for disregarding limitations found in his medical source statement. (docs. 18-1 at 27 (citing *id.* at 944-48, 949-957); 22 at 3-15.)  Because the regulations require only that the ALJ "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision", he properly evaluated Dr. Chindhy's medical opinion. *See Gentry v. Saul*, No. 3:19-CV-778, 2020 WL 5100848, at *8 (M.D. Tenn. Aug. 10, 2020), *report and recommendation adopted sub nom. Gentry v. Soc. Sec. Admin.*, No. 3:19-CV-00778, 2020 WL 5096952 (M.D. Tenn. Aug. 28, 2020) (finding that the ALJ properly evaluated a medical opinion where he specifically found it was not supported by the plaintiff's treatment records or the objective medical evidence and was inconsistent with the plaintiff's medical records); *see also* 20 C.F.R. § 416.920c(b)(2).

The ALJ's reasons for not including portions of Dr. Chindhy's opinions into his disability determination finding, combined with his review and analysis of the objective record, satisfy his duty under the regulations. He explained in detail why he found the overall evidence, including Dr. Chindhy's medical source statement, the course of treatment, and the objective medical evidence, unsupported and inconsistent with Plaintiff's subjective allegations of disabling conditions and with Dr. Chindhy's own findings in the consultative examination. *See Cherrell Carson Footman v. Andrew M. Saul*, *Comm'r of Soc. Sec.*, No. 1:19-CV-1200, 2020 WL 6728937,

25

at *11 (M.D.N.C. No. 16, 2020) (finding that the language in the ALJ's discussion makes clear that her "analysis comports with the new regulations, as she properly considered the supportability and consistency of [the medical] opinions, as well as disregarded [the ] opinion that [the] [p]laintiff lacked the ability to work as a matter reserved to the Commissioner.").   Therefore, the ALJ properly considered Dr. Chindhy's opinions, and remand is not required on this issue.

**B.  FNP Stalder's Opinion**

Plaintiff also argues that the ALJ erred under 20 C.F.R. § 416.920c by failing to discuss the persuasiveness of FNP Stalder's opinion. (doc. 22 at 1, 15.)

As noted, under the new regulations, a medical opinion is a "statement from a medical source *about what [the claimant] can still do* despite [his] impairment(s) and whether [he] [has] one or more impairment-related limitations or restrictions in the following abilities": ability to perform physical demands of work activities; to perform mental demands of work activities; to perform other demands of work; and to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2)(i)-(iv) (emphasis added); *cf. id.* § 404.1527 (defining medical opinions as statements from medical sources that reflect judgment about the nature and severity of a claimant's impairments, *including* his symptoms, diagnosis and prognosis, *what he can still do despite impairment(s),* and his physical or mental restrictions) (emphasis added).   The ALJ is required to explain the persuasiveness of "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* § 416.920c(b).   The sole responsibility for a disability determination rests with the ALJ, however. *See Newton*, 209 F.3d at 455.

Here, the March 2019 letter of FNP Stalder[18], on behalf of Dr. Farrell at Frontier Family

Health, in its entirety stated:

> [Plaintiff] was seen and evaluated in our office 03/21/2019 for the purpose of completing
> his [Department of Transportation] medical examination so as to qualify to apply for re-
> instatement of his [CDL].  It was determined that [Plaintiff] was unable to meet some of
> the requirements of the medical exam.  Key items that he failed included: inability to raise
> both legs (which would be necessary for operating the brakes, clutch and accelerator.  His
> deep tendon reflexes in both legs were poor.  Range of motion in both arms was markedly
> impaired making it unlikely that he would be able to access all surfaces of his rig and
> possibly be compromised in maneuvering the steering wheel abruptly.

(doc. 18-1 at 554.)  It merely listed Plaintiff's physical limitations and opined that he was unable

to meet some of the requirements of the CDL medical exam. Because it did not include findings

regarding what Plaintiff could still do despite his impairments, it was not a medical opinion. *See*

20 C.F.R. § 404.1513(a)(2).

Even if the letter was a medical opinion, an ALJ remains free, upon a showing of good

cause, to assign little or no weight to the opinion of any medical source when the source's

statements are brief and conclusory, not supported by medically acceptable clinical laboratory

diagnostic techniques or otherwise unsupported by the evidence. *Holifield v. Astrue*, 402 F. App'x

24, 26 (5th Cir. 2010) (citations omitted).  "Form reports in which a physician's obligation is only

to check a box or fill in a blank are weak evidence at best.... [but when] these so-called reports 'are

unaccompanied by *thorough* written reports, their reliability is suspect.'" *See Bruen v. Kijakazi*,

No. 1:20-CV-278-LGI, 2022 WL 452411, at *3 (S.D. Miss. Feb. 14, 2022) (citing *Mason v.

Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (emphasis added) (citation omitted)).

---

[18] Under 20 C.F.R. § 404.1502(a)(7), a nurse practitioner, like FNP Stalder, is an "acceptable medical source" for
claims filed on or after March 27, 2017. *Britton v. Saul*, 827 F. App'x 426, 430 (5th Cir. 2020); doc. 18-1 at 554.

Although FNP Stalder's letter was not a form report, it was not a "thorough" written report either; it was a brief and conclusory letter that, as noted by the ALJ, did not include any explanatory notes, supporting tests, or physical examination records. (doc. 18-1 at 20 (citing *id.* at 554.))  Even so, the ALJ's decision reflects that he still considered the findings reported in the letter that Plaintiff was unable to raise both of his legs, that his tendon reflexes were poor bilaterally, and that he had markedly impaired range of motion in both his upper extremities, although he did not make a specific finding as to each of the five factors in 20 C.F.R. § 404.1520c(c)(1)-(5). (*See id.*)

Because the ALJ considered FNP Stalder's letter in his decision, "carefully" reviewed the facts of the case, and gave "careful consideration" of the entire record, including the medical opinions and prior administrative medical findings in accordance with the requirements of 20 CFR § 416.920c, his RFC determination is supported by substantial evidence. *See Swingle v. Comm'r of Soc. Sec. Admin.*, No. 6:20-CV-365-ORL-MCR, 2020 WL 6708023, at *5 (M.D. Fla. Nov. 16, 2020) (finding that the ALJ properly addressed the supportability and consistency factors and because his RFC determination was based on medical evidence in record, it was supported by substantial evidence).  Remand is therefore not required on this issue.

## V.    CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 30th day of March, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

28